**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| JERRY R. JOSLEYN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:07-CV-392 |
| v. | ) | |
| | ) | |
| HYDRO ALUMINUM NORTH | ) | |
| AMERICA, INC., a Maryland | ) | |
| Corporation, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on: (1) Defendant Hydro
Aluminum North America, Inc.'s Motion for Summary Judgment, filed
on June 27, 2008; and (2) Defendant Hydro Aluminum North America,
Inc.'s Motion to Strike Affidavits of Jerry R. Josleyn and Kathy
Flora, filed on August 14, 2008. For the reasons set forth below,
the Motion to Strike is **GRANTED in PART and DENIED in PART** and the
Motion for Summary Judgment is **GRANTED**. Accordingly, the clerk is
**ORDERED** to enter judgment in favor of Defendant and close this
case.

BACKGROUND

Plaintiff, Jerry R. Josleyn ("Josleyn"), filed suit against

his former employer, Defendant, Hydro Aluminum North America, Inc. ("Hydro Aluminum"), alleging he was terminated in violation of the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq*., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621. Hydro Aluminum has filed a motion for summary judgment, claiming that there is no genuine issue of material fact and it is entitled to judgment as a matter of law on both claims. Hydro Aluminum has also filed a motion to strike two affidavits Josleyn attached to his response to Hydro Aluminum's motion for summary judgment.

MOTION TO STRIKE

Hydro Aluminum has filed a motion to strike the affidavits of Plaintiff and Kathy Flora, both of which were attached to Plaintiff's summary judgment response brief. Hydro Aluminum has requested the Court strike these affidavits because neither of them contain actual signatures of the affiants. Instead, the affidavits contain only "electronic signatures." In addition, Hydro Aluminum seeks to strike certain statements contained in Plaintiff's affidavit because they contain inadmissible affidavit testimony. Unfortunately, for both the Court and Plaintiff, Plaintiff has failed to respond to this motion.

Hydro Aluminum first asks this Court to strike the two affidavits because they are unsigned and bear only an "electronic

-2-

signature."  While signatures are required on affidavits, Hydro Aluminum has failed to cite to any legal authority that would suggest an "electronic signature" is insufficient.  Without being provided any such authority, this Court declines to strike the affidavits on this basis.  See *Magyar v. Saint Joseph Regional Medical Center*, 544 F.3d 766, 770 (7th Cir. 2008)(doubting than an affidavit containing an affiant's electronic signature in lieu of an actual signature constitutes a defect).  The Court will now consider the statements in question contained in Plaintiff's affidavit.

<u>Affidavit of Jerry R. Josleyn</u>

Hydro Aluminum seeks to strike a number of statements contained in Plaintiff's affidavit, claiming they are inadmissible affidavit testimony.  "Supporting and opposing affidavits must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Federal Rule of Civil Procedure 56(e)(1).  On a motion for summary judgment, a court is not to consider those parts of an affidavit that fail to comply with Rule 56(e).  *Friedel v. City of Madison*, 832 F.2d 965, 970 (7th Cir. 1987).  The following statements do not comply with Rule 56(e) and will should be disregarded: (1) conclusory allegations lacking supporting evidence; (2) legal argument; (3) self-serving statements without

factual support in the record; (4) inferences or opinions not "grounded in observation or other first-hand experience; and (5) mere speculation or conjecture. *Heltzel v. Dutchmen Mfg., Inc.*, No. 3:06-CV-227, 2007 WL 4556735 *4 (N.D. Ind. Dec. 20, 2007)(citations omitted). With these principles established, the Court will consider Hydro Aluminum's arguments.

Paragraph 4

Plaintiff states that after his 2003 right kidney removal: "I considered myself to be a 'qualified individual with a disability' within the meaning of that term of the Americans With Disabilities Act." Hydro Aluminum argues that this statement should be stricken as a self-serving statement without factual support in the record and because it contains an impermissible legal conclusion. This Court agrees with both of Hydro Aluminum's contentions and strikes the complained of statement. Indeed, Plaintiff's statement is simply an unsupported legal conclusion. Plaintiff does not make any supporting factual statements or provide any supporting documents regarding the effects of his condition that would even support such a legal conclusion - i.e. "I cannot stand for more than 10 minutes at a time," or "I cannot lift more than 5 pounds."

Paragraph 7

Plaintiff states: "Michelle Hurford had knowledge of the

earlier surgical removal of my cancerous right kidney." Hydro Aluminum argues that this should be stricken as it is mere speculation and an impermissible inference not grounded in any first-hand knowledge. Because Plaintiff does not set out facts that show he is competent to testify to this matter, it must be stricken. *Woods v. City of Chicago*, 234 F.3d 979, 984 (7th Cir. 2000). This conclusion is really without import, though, as exclusion of this statement does not affect this Court's conclusion on the motion for summary judgment.

Further in paragraph 7, Plaintiff states that "[i]n my request for accommodation, I additionally noted to my supervisors that my renal health would be further endangered in the coming Spring and Summer months" and "I noticed that my renal health condition deteriorated, as I sweat more profusely . . .." Hydro Aluminum requests these two statements be stricken because they directly contradict his deposition testimony that throughout his employment he did not know of any correlation between his renal status and his discomfort with the factory heat. Hydro Aluminum cites to page 187 of Plaintiff's deposition, where Plaintiff testifies that he did not know his nausea and aches were related to his renal insufficiency. Because the cited deposition testimony does not directly contradict the affidavit's statements, the Court does not strike these statements.

Paragraph 8

Plaintiff states that he received disciplinary attendance points for "refusing to work overtime hours due to my renal health condition." Hydro Aluminum suggests that such a statement should be stricken because it speculates that Hydro Aluminum supervisors knew Plaintiff would not work because of his renal health. Hydro Aluminum further argues that it contradicts Plaintiff's prior deposition testimony that he never informed anyone of a connection between his renal status and his unwillingness to work.

Plaintiff's statement in his affidavit is contradicted by his deposition testimony where he admits never specifying his renal condition as the reason he refused to work overtime. (Def's Ex. A, pp. 187, 190-91). Because the affidavit conflicts with Plaintiff's deposition testimony, the statement in the affidavit must be stricken. *Adusumilli v. City of Chicago*, 164 F.3d 353, 360 (7th Cir. 1998).

In this paragraph, Plaintiff also states that a copy of an internal Hydro Aluminum calendar was "provided to me at the time of my April 27, 2006 termination." Hydro Aluminum requests this statement be stricken as it, too, directly contradicts Plaintiff's prior deposition testimony. At his deposition, Plaintiff did testify that he was not provided a copy of the calendar. (Def. Ex. A, p. 215). Thus, the contradictory affidavit statement must be stricken. *Id.*

<u>Paragraph 9</u>

Plaintiff states: "Therefore, I continue to state that at most- as of the date of my termination on April 17 [sic] 2006 - I had accumulated merely four and one-half points under the said 'Company Attendance Policy' and I should not have been terminated by Hydro until I had fully attained the threshold for termination under that policy, to-wit, a total of five (5) points."  Hydro Aluminum requests the Court strike this statement as being contradictory to his prior deposition testimony.  In Plaintiff's deposition, he did in fact admit to being terminated for having five points.  (Def. Ex. A, pp. 137, 190, 227).  Thus, the contradictory statement in Plaintiff's affidavit is stricken.


<u>Paragraph 11</u>

Hydro Aluminum argues the opening phrase: "In addition to the discriminatory and prohibited Hydro adverse employment action of refusing my reasonable request for accommodation under the Americans With Disabilities Act," should be stricken as an impermissible legal conclusion.  Hydro Aluminum also argues he second to last sentence of this paragraph ("I have contended, in my Complaint, that such age-biased statements demonstrate a pre-existing animosity, on the part of Hydro's supervisory management, against myself and also against my "older" former co-workers, such as Ronald Jared and Kathleen Clifton.") should be stricken because

it contains legal conclusions and speculative conjecture surrounding the motivation behind other Hydro Aluminum employees' conduct. Neither of the two complained of statements are admissible and are stricken.

The remaining portion of paragraph 11 is a description of comments allegedly made by Allen Grace to Kathy Flora. Plaintiff did not hear Grace's alleged statements, nor does Plaintiff explain how he has personal knowledge of them. (Def. Ex. A, p. 229). Thus, the statements are hearsay. Paragraph 11 is stricken in its entirety.

Paragraph 12

Plaintiff describes a NIOSH Publication and makes statements regarding what standards are set by the publication and contends that Hydro Aluminum did not comply with those standards. To the extent Plaintiff makes a legal conclusion that Hydro Aluminum did not meet industry standards, this paragraph is stricken.

Paragraph 13

Plaintiff states that Hydro Aluminum's management has an "age-biased animosity" and concludes that Hydro Aluminum replaced him with a substantially younger and healthier worker. Hydro Aluminum requests this paragraph be stricken because it is not based on personal knowledge and it contains impermissible legal conclusions.

This Court agrees.

### Paragraph 14

Plaintiff comments on the veracity of the statements contained in the affidavit of Nancy Kovacs. While Hydro Aluminum requests this Court strike the paragraph as being legal argument and speculation, this Court declines Hydro Aluminum's request.

## MOTION FOR SUMMARY JUDGMENT

### Summary Judgment Standard

The standards that generally govern summary judgment motions are familiar. Pursuant to Rule 56© of the Federal Rules of Civil Procedure, summary judgment is proper only if it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In other words, the record must reveal that no reasonable jury could find for the nonmovant. *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 335 (7th Cir. 1991); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). In deciding a motion for summary judgment, a court must view all facts in the light most favorable to the nonmovant. *Anderson*, 477 U.S. at 255; *Nucor Corp. v. Aceros Y Maquilas De Occidente*, 28 F.3d 572, 583 (7th Cir. 1994).

The burden is upon the movant to identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," if any, that the movant believes demonstrate an absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the movant has met this burden, the nonmovant may not rest upon mere allegations but "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). "Whether a fact is material depends on the substantive law underlying a particular claim and 'only disputes over facts that *might affect the outcome* of the suit under governing law will properly preclude the entry of summary judgment.'" *Walter v. Fiorenzo*, 840 F.2d 427, 434 (7th Cir. 1988) (citing *Anderson*, 477 U.S. at 248).

"[A] party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial." *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir. 1988) (emphasis in original); *see also Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391 (7th Cir. 1993). Therefore, if a party fails to establish the existence of an essential element on which the party bears the burden of proof at

trial, summary judgment will be appropriate.

Facts

Hydro Aluminum employed Josleyn at its aluminum product manufacturing plant in North Liberty, Indiana ("the Plant") from July 1994 until his termination on April 27, 2006. (Complaint, ¶¶ 1, 2; Josleyn Tr. at 33). Josleyn held a number of different positions while working at the Plant, including band saw operator, packer, and material handler. (Josleyn Tr. at 39, 45). During his last three years at Hydro Aluminum, Josleyn worked primarily as a material handler. (Josleyn Tr. at 81). As a material handler, Josleyn would move materials with a forklift or crane throughout the Plant, walking and driving through all the areas on the Plant floor. (Josleyn Tr. at 91-92). Josleyn would also occasionally work as a packer. (Josleyn Tr. at 81-82). As a packer Josleyn did some heavy lifting for brief periods of time. (Josleyn Tr. at 84-85).

In August 2003, Josleyn had surgery to remove one of his kidneys due to a cancerous tumor. (Josleyn Tr. at 10, 11). Josleyn received approximately six weeks of medical leave for the surgery and recovery period. (Kovacs Aff. at ¶ 3). Josleyn claims he is disabled because, as a result of the surgery, he has only one kidney. (Josleyn Tr. at 10; *see also* Complaint Factual Statement ¶¶ 1, 2 (referring to Josleyn's solitary kidney as a "renal disability" and "renal condition"); Response to Hydro Aluminum's

First Set of Interrogatories No. 2 (Motion, Ex. C) (referring to condition as "renal insufficiency"). After his surgery, Josleyn returned to work on September 8, 2003. (Kovacs Aff. at ¶ 4). At that time, Josleyn's surgeon, Dr. Mark Dabagia, released Josleyn to work without restrictions. *See* 9/3/03 fax from Dr. Dabagia to Kovacs (Motion, Ex. A-1) (marking "return to regular work" on September 8, 2003 with "no restrictions"); (Josleyn Tr. at 12, 112-13) (after surgery "was cleared for full duty by my doctor."). Upon his return to work, Josleyn did not inform anyone at Hydro Aluminum that his renal condition impaired his ability to engage in any activities. (Josleyn Tr. at 103, 108).

After his surgery, Josleyn had follow-up visits with both Dr. Dabagia and with Dr. Kendra Hendon, a renal health specialist. (Josleyn Tr. at 16, 28). Josleyn also visited his family doctor, John Larson. (Josleyn Tr. at 31-32, 78). In December 2005, Dr. Dabagia told Josleyn that he had a "clean bill of health," and his "other kidney was functioning and that there was no cancer left to respread to the other side; that he had gotten it all." (Josleyn Tr. at 28). Dr. Dabagia never told Josleyn that he would be limited in any way as a result of having only one kidney. (Josleyn Tr. at 28). Josleyn did not see Dr. Dabagia again after his December 2005 visit. (Josleyn Tr. at 31). Josleyn had multiple visits with Dr. Hendon after his surgery. (Josleyn Tr. at 17, 22, 27). The only specific limitation Dr. Hendon ever gave to Josleyn was a

recommendation to "protect his left arm" in case the need ever arose for dialysis. (Josleyn Tr. at 19-21, 23-24). Josleyn's last visit to Dr. Hendon was in December 2005. (Josleyn Tr. at 31). No doctor ever advised Josleyn to limit his activity, other than protecting his arm, as a result of having only one kidney. (Josleyn Tr. at 13). In fact, there were no activities that Josleyn could do before he had surgery that he could not do after the surgery. (Josleyn Tr. 12, 108).

On January 16, 2006, Hydro Aluminum revised its uniform requirements for all union and salaried employees, including Josleyn. *See* Uniform Policy (Motion, Ex. A-2); (Kovacs Aff. at ¶ 5). The revised policy required employees to wear a long-sleeved shirt. (Uniform Policy; Kovacs Aff. at ¶ 5). The long-sleeved shirt policy was enacted to help reduce arm injuries. (Uniform Policy; Kovacs Aff. at ¶ 6). Prior to the implementation of the long-sleeved shirt policy, Josleyn himself was badly scraped on his arm. (Josleyn Tr. at 143). Josleyn knew of the revised uniform policy before it was implemented and understood what was required. (Josleyn Tr. at 115, 149). According to Josleyn, all employees were angry about the new policy because the Plant "conditions don't warrant wearing the long-sleeved shirts." (Josleyn Tr. at 126). There are ovens and machinery located throughout the floor of the Plant that give off heat. (Josleyn Tr. at 69-70).

According to Josleyn, a number of employees complained at

staff meetings with Nancy Kovacs that the shirts would make them too hot. (Josleyn Tr. at 128). Josleyn claims that as a result of wearing a long-sleeved shirt he was sick to his stomach and would sweat more than he had before. (Josleyn Tr. at 156). Josleyn also heard other employees complain about the effects of wearing the shirts – that it made the environment too hot, that they were sweating, and that they needed more liquid. (Josleyn Tr. at 158). Hydro took efforts to cool down the Plant environment, including having wall fans that blew on some of the work areas and providing water coolers throughout the Plant that employees could access as needed. (Josleyn Tr. at 94; Kovacs Aff. at ¶ 7). There were also three loading dock doors on the factory walls that could be opened when the environment was uncomfortable. (Josleyn Tr. at 67; Kovacs Aff. at ¶ 7).

Josleyn would also do a number of things personally to cool himself down. Josleyn took breaks throughout the day, during which time he would go to the air conditioned break room located off the factory floor. (Josleyn Tr. at 74-75). Josleyn would also get drinks of water, stand still, or take a break in an air conditioned office as needed. (Josleyn Tr. at 93-94, 160, 164). No management person or supervisor ever complained about or reprimanded Josleyn for getting water or taking these breaks. (Josleyn Tr. at 164).

Josleyn complained to his shift supervisors that wearing the long-sleeved shirt was making him sick, but never explained to the

supervisors in what way he felt sick or that the discomfort was related to having one kidney. (Josleyn Tr. at 168). When his supervisor asked him during his shift if he was okay, Josleyn would respond "yeah; I'm hot, you know, but I look like this when I get hot." (Josleyn Tr. at 169). Josleyn never spoke to a doctor about his alleged difficulties working in the heat. (Josleyn Tr. at 164). No doctor ever told Josleyn that he was heat intolerant, and Josleyn did not notice a difference in his heat tolerance from before his surgery to after his surgery. (Josleyn Tr. at 164).

Josleyn visited his family doctor, John Larson, on January 26, 2006, and on April 27, 2006, the day of his termination from Hydro Aluminum. (Def's Motion, Ex. D). Even though the January visit was after Hydro implemented its long-sleeved shirt policy, Josleyn made no complaints about his heat tolerance to Dr. Larson, complaining instead of two unrelated minor ailments. 1/26/06 Clinic Visit Notes. Josleyn's April appointment with Dr. Larson was on the day he was terminated from Hydro aluminum, but there is no mention in the doctor's notes of any issues with heat; rather, Josleyn "denie[d] any complaints." 4/27/06 Clinic Visit Notes.

Josleyn is a member of the Local 194 United Auto Workers Union ("the Union"), and his employment with Hydro Aluminum was governed by a Collective Bargaining Agreement ("CBA") between the Union and Hydro Aluminum. (Josleyn Tr. at 76; Kovacs Aff. at ¶ 8). Hydro has an attendance policy under which employees at the Plant accrue

"points" if they fail to follow the policy's requirements. *See* Hydro Aluminum Bargaining Unit Attendance Policy (Motion, A-4); (Kovacs Aff. at ¶ 11). Under the policy, Hydro Aluminum can impose points for various infractions, such as tardiness and unexcused absences. Attendance Policy at 2-3. If an employee earns two points, he will receive a verbal warning, if he earns three points, he will receive a written warning, and if he earns five points, he will be terminated. Attendance Policy at 4.

Every calendar year, the employee's points from the preceding year are erased and the employee begins the year with zero points. Attendance Policy at 4. All employees are required under the CBA to cover unscheduled overtime when requested. (Kovacs Aff. at ¶ 9; CBA at 18-19 (Motion, Ex. A-3)). Hydro Aluminum has a mandated process that it follows when overtime shifts are needed in a department. (Kovacs Aff. at ¶ 10; Josleyn Tr. at 197). The supervisor in the department asks the three people with the lowest recorded level of overtime if they want to work the overtime shift. (Kovacs Aff. at ¶ 10). If all three people refuse, then, pursuant to the CBA, the person with the lowest overtime is required to work the shift or get someone else to cover the shift. (Kovacs Aff. at ¶ 10; Josleyn Tr. at 198) ("per the union contract, you have to cover the overtime. And if you do not cover the overtime, which I didn't, then it's your responsibility to either cover the overtime or find somebody else to do it for you."); CBA at 18-19.

Under the attendance policy, failure to cover a shift of required unscheduled overtime results in the accrual of ½ a point. Attendance Policy at 4. The attendance policy also rewards employees for perfect attendance – awarding employees bonuses at six months and at twelve months if they have not missed any shifts. Atendance Policy at 4. Josleyn knew about Hydro's attendance policy and understood that he would be terminated if he earned five points under the policy. (Josleyn at 196; Acknowledgment of Policy signed by Josleyn (Motion, Ex. A-5). Josleyn was not aware of any Hydro Aluminum employee who was allowed to continue working at Hydro Aluminum after accruing five points under the attendance policy. (Josleyn Tr. at 225-26).

At some time around the beginning of April 2006, Josleyn sent a letter to Martin Carter, the North American head of Hydro Aluminum. (Josleyn Tr. at 171). In the letter, Josleyn complained about Hydro's policies. Josleyn Letter to Carter (Motion, Ex. E). Specifically, he complained that the long-sleeved shirts required under the uniform policy were "not compatible with the summer environment." (Motion, Ex. E). Josleyn's purpose in writing the letter was to tell Carter that the point system, the bonus system, and the long-sleeved shirt policies were unfair to all Hydro employees. (Joselyn Letter to Carter; Josleyn Tr. at 170-81). Josleyn concedes that his letter to Carter did not reference him personally or his renal condition specifically, rather it discussed

Josleyn's perception that all employees suffered as a result of Hydro Aluminum's uniform and attendance policies. (Josleyn Tr. at 182).

In response to Josleyn's letter, Nancy Kovacs and John Burkett, the director of the Plant, met with Josleyn and Leonard Grosswaller, a union representative. (Josleyn Tr. at 183). At the meeting, Josleyn said that the overtime was making him nauseous and gave him aches in his shoulder, and that it was too hot. (Josleyn Tr. at 187). Josleyn never requested that he receive any accommodation because of any renal health issue and never said that his discomfort in the heat was related to his renal insufficiency. (Josleyn Tr. at 187).

Six months after Josleyn's termination from Hydro Aluminum, his renal specialist Dr. Hendon wrote a letter "to whom it may concern" stating that it was her opinion that Josleyn "would be able to work in extreme heat temperatures as long as he would be able to drink periodically to keep hydrated." (Motion, Ex. F). The letter makes no mention of any restrictions in the number of hours Josleyn could work or in the type of uniform he could wear. (Motion, Ex. F).

Josleyn did not work required overtime shifts on February 1, 2, 3, and 9, 2006 and, as a result, he accumulated two points under the attendance policy. (Kovacs Aff. at ¶ 13). On or around February 20, 2006, Hydro issued a disciplinary action to Josleyn warning him

that he had accumulated two points under the Absenteeism Policy.(Motion, Ex. A-6). Josleyn signed the disciplinary action. 2/20/06 Disciplinary Action; (Josleyn Tr. at 205). At the time of receiving the warning, Josleyn was not surprised to receive it and did not protest the calculation of points. (Josleyn Tr. at 206-07).

Josleyn did not work required overtime shifts on February 10 and April 1, 2006 and, as a result, he accrued an additional point under the attendance policy. (Kovacs Aff. at ¶ 14). On or around April 10, 2006, Hydro issued a second disciplinary action to Josleyn warning him that he had accumulated three points under the Absenteeism Policy. *Id*.; 4/10/06 Disciplinary Action (Motion, Ex. A-7); Josleyn signed the disciplinary action. (4/10/06 Disciplinary Action; Josleyn Tr. at 208). At the time of receiving the warning, Josleyn agreed that he had accumulated three points under the policy. (Josleyn Tr. at 211). Josleyn did not work required overtime shifts on April 7, 19, 25, and 26, 2006 and, as a result, he accrued an additional two points under the attendance policy. (Kovacs Aff. at ¶ 15). On April 27, 2006, Hydro Aluminum issued a third and final disciplinary action to Josleyn advising him that he had accumulated a total of five points.(Kovacs Aff. at ¶ 15; 4/27/06 Disciplinary Action (Motion, Ex. A-8)). Josleyn signed the final disciplinary action. (4/27/06 Disciplinary Action; Josleyn Tr. at 215-16). At the time of receiving the final disciplinary action, Josleyn did not protest that he had accumulated five

points. (Josleyn Tr. at 216).

Nancy Kovacs made the decision to terminate Josleyn based upon his violation of Hydro Aluminum's attendance policy. (Kovacs Aff. at ¶ 16). According to Josleyn, he refused to work his requisite overtime shifts after the implementation of the revised uniform policy because he was too worn out. (Josleyn Tr. at 169). Josleyn admits he "probably did not" mention his renal condition when he refused to work the required overtime shifts. (Josleyn Tr. at 36, 191). Hydro Aluminum terminated Josleyn's employment on April 27, 2006 because he incurred five points under the attendance policy by not working overtime shifts on February 1, 2, 3, 9, and 10, and April 1, 7, 19, 25, and 26, 2006. (Kovacs Aff. at ¶ 17; 2006 Absentee Calendar for employee Jerry Josleyn (Motion, Ex. A-9)). Josleyn did not dispute that he was the person with the least amount of overtime on the ten times that he was asked to cover the overtime shifts; Josleyn also admits that he did not cover the shifts on those occasions. (Josleyn Tr. at 200). Josleyn also does not dispute that he incurred five points under the policy as a result of failing to work the requisite overtime shifts. (Josleyn Tr. at 137-38) ("you get five points during that year, you were gone. That's what happened to me."); 190 ("Because I got the 10 points, I was gone . . . you know, 10 times of not working four hours over is a half a point. An accumulation of five points was when I was fired."); 227 ("Hydro fired me because I acquired five

points.").

Josleyn has never heard anyone at Hydro Aluminum make an age-biased statement. (Josleyn Tr. at 229). Josleyn claims he heard from another employee, Kathy Flora, that Allen Grace, a supervisor in the shipping department at the Plant, made age-biased statements to her after she requested reinstatement to a position that she formerly held. (Josleyn Tr. at 230). Grace allegedly told Flora that "in retaliation for her wanting her job back, he was going to fire three of her friends." (Josleyn Tr. at 230). Grace allegedly identified the three friends as Josleyn, because of his "older back," Ronald Jared, because of his "older legs," and Kathleen Clifton, because of her diminished strength. (Josleyn Tr. at 230). Allen Grace was not Josleyn's direct supervisor and did not participate in Josleyn's termination. (Kovacs Aff. at ¶ 18). In fact, Grace was terminated from Hydro Aluminum on April 1, 2005, more than a year before Josleyn's termination. (Kovacs Aff. at ¶ 19).

Kathy Flora, Kathleen Clifton, and Ronald Jared were never terminated from Hydro. (Kovacs Aff. at ¶ 20). Kathy Flora voluntarily quit from Hydro on July 19, 2005, Kathleen Clifton retired on March 6, 2006, and Ronald Jared continues to work at Hydro Aluminum. (Kovacs Aff. at ¶ 20).

Hydro Aluminum applied its attendance policy equally to all employees regardless of age. (Kovacs Aff. at ¶ 21). From April

2005 through September 2006, Hydro Aluminum terminated ten hourly employees because they each accrued five points under the attendance policy. (Kovacs Aff. at ¶ 22; List of Terminated Employees (Motion, Ex. A-10)). The youngest of the ten employees was age 21 at termination, the oldest was Josleyn at age 56. (Kovacs Aff. at ¶ 22).

Hydro Aluminum has requested summary judgment on both Plaintiff's ADA and ADEA claims. These will be addressed in turn.

<u>ADA</u>

The ADA protects "qualified individuals with a disability" from discrimination in their employment and the hiring process. 42 U.S.C. § 12112(a); *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 571-72 (7th Cir. 2001). In order to prove actionable discrimination under the ADA, a plaintiff must show: (1) that he is disabled within the meaning of the ADA; (2) that he is qualified to perform the essential functions of the job; and (3) that he suffered an adverse employment action because of her disability. *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 641 (7th Cir. 2005). A complaining party can demonstrate discrimination by either providing direct evidence of discriminatory motive or intent, or by relying on the indirect method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff has opted to rely on the indirect method.

A)   <u>Disabled within the meaning of the ADA</u>

The first question that must be addressed is whether Plaintiff is disabled, as defined under the ADA.  If he is not disabled, then he cannot pursue a claim under the ADA.  An individual can prove that he is disabled for ADA purposes in one of three ways: (1) he has a physical or mental impairment that substantially limits one or more major life activities; (2) he has a record of such an impairment; or (3) he is regarded as having such an impairment by her employer.  42 U.S.C. § 12102(2); *Sutton v. United Air Lines*, 527 U.S. 471, 478 (1999).

(1)   Actually disabled–substantially
<u>limited in a major life activity</u>

There is no dispute that Plaintiff had his right kidney surgically removed in 2003.  The dispute arises as to whether Plaintiff's' condition makes him disabled under the ADA.  Plaintiff considers himself to be a qualified individual with a disability within the meaning of the ADA, but that is of little importance.

In determining if an impairment is substantially limiting, this Court considers: (1) the nature and severity of the impairment; (2) the duration or expected duration of impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of, or resulting from, the impairment.  29 C.F.R. § 1630.2(j).  Plaintiff has wholly failed to present any evidence that his renal condition substantially limits

any major life activity.  This is not surprising as the evidence overwhelmingly demonstrates that his renal condition did not limit any major life activity. (Stmt. Material Facts ¶¶ 5, 10, 20, 34); See *Sutton*, 527 U.S. at 84 (teaching that a medical condition itself is not the determining factor in proving disability but, rather, the effect on the individual).

Upon examining the nature, severity and duration of Plaintiff's impairment, this Court concludes, on the record before it, a trier of fact could not reasonably conclude that Plaintiff's impairment substantially limited any major life activity.

### (2) Record of disability

As set forth above, even if Plaintiff does not have a physical or mental impairment that substantially limits one or more major life activities, he is still "disabled" under the ADA if she has a record of such an impairment.  However, Plaintiff does not argue that he has a record of disability.

Nevertheless, while Hydro Aluminum may have had records of his renal condition, these are not evidence that she had a record of being statutorily disabled. *Rooney v. Koch Air, LLC*, 410 F.3d 376, 381 (7th Cir. 2005).  Again, not all impairments qualify as a disability within the meaning of the ADA. *Dalton v. Subaru-Isuzu Auto.*, 141 F.3d 667, 675 (7th Cir. 1998).  This is especially true here as Plaintiff continued to work at Hydro Aluminum until his

termination.  At most, Plaintiff complained to Hydro Aluminum about having to wear long-sleeve shirts at work.   Even then, though, Plaintiff did not attribute these complaints to his renal condition.  As such, Plaintiff has failed to present evidence that Hydro Aluminum had a record that he was substantially limited in a major life activity.

### (3) Regarded as disabled

Finally, Plaintiff can demonstrate that he was "disabled" for ADA purposes if he was regarded as  having a physical or mental impairment that substantially limits one or more major life activities.  He may proceed under this `theory by showing "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities; or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton*, 527 U.S. at 489.  However, Plaintiff does not present any evidence to support such a proposition.

At most, Plaintiff could contend that Hydro Aluminum viewed him as being substantially limited from working overtime at the Plant with a long sleeve shirt.  This argument would fail though because the "substantially limits" test cannot be simply met by showing that the employer thinks the employee is unable to perform

a specific job or task. *Kupstas v. City of Greenwood*, 398 F.3d 609, 612-13 (7th Cir. 2005). Rather, the employer must think the employee is substantially limited in a major life activity. There is no evidence in the record that Plaintiff was regarded as being disabled, as defined by the ADA, by Hydro Aluminum. Consequently, because Plaintiff is not disabled under the ADA, his claim fails as a matter of law.

ADEA

The ADEA proscribes employment discrimination on account of a person's age. 29 U.S.C. § 623. There are two methods by which a plaintiff may show employment discrimination: the direct and indirect methods. *Krchnavy v. Limagrain Genetics Corp.*, 294 F.3d 871, 875 (7th Cir. 2002). Plaintiff attempts to proceed under the indirect method using the familiar burden-shifting approach outlined in *McDonnell Douglas*. *McDonnell Douglas v. Green*, 411 U.S. 792 (1973); *Barricks v. Eli Lily & Co.*, 481 F.3d 556, 559 (7th Cir. 2007).

In order to establish a prima facie case of age discrimination, Plaintiff must prove that: (1) he is a member of a protected class; (2) his performance met Hydro Aluminum's legitimate expectations; (3) despite his performance, he was subject to an adverse employment action; and (4) Hydro Aluminum treated similarly situated employees outside of his protected class

more favorably. *Barricks*, 481 F.3d at 559. If Plaintiff can successfully make a showing of a prima facie case of discrimination, the burden then shifts to Hydro Aluminum to provide a legitimate, non-discriminatory reason for its decision to terminate his employment. *Id.* Once Hydro Aluminum meets its burden, Plaintiff may attack Hydro Aluminum's proffered reason as a mere pretext for discrimination. *Id.*

Turning first to the prima facie case, this Court finds that Plaintiff has failed to make the necessary showing. To show that he performed his job to his employer's expectations, Plaintiff relies on statements contained in his own affidavit as well as those contained in Kathy Flora's. In his affidavit, Plaintiff claims that he "satisfactorily performed" his duties. (Josleyn Aff. ¶ 5). And, Flora, another former employee of Hydro Aluminum stated that, from her observation of Plaintiff, she "found him to be a competent worker and that he consistently performed his duties to the level of Hydro's expectations for that Material Handler position." (Flora Aff. ¶ 4). The conclusory statements contained in these affidavits lack foundation, are unsubstantiated, and do not raise an inference that Plaintiff was meeting Hydro Aluminum's legitimate expectations at the time of his termination. *Drake v. Minnesota Mining & Mfr. Co.*, 134 F.3d 878 (7th Cir. 1998).

Tellingly, Plaintiff claims to "satisfactorily perform" his duties only up until January 16, 2006, the date Hydro Aluminum

instituted the new uniform requirement. After that date – when the new uniform policy was in place– he admits that he refused to work required overtime. (Josleyn Aff. ¶¶ 5, 6, 8). And, while Kathy Flora claims that Plaintiff was meeting Hydro Aluminum's legitimate expectations, she only worked at the Plant until July 2005. (Flora Aff. ¶ 2). Thus, she has no personal knowledge about Plaintiff's performance when the new uniform policy was in place.

Not only has Plaintiff failed to show that he met Hydro Aluminum's legitimate expectations, but Plaintiff has also failed to show that Hydro Aluminum treated similarly situated employees outside of his protected class more favorably.[1] The uncontroverted facts are that Hydro Aluminum applied its attendance policy equally regardless of age. (Stmt. Mat. Fact ¶ 44). Thus, Plaintiff has failed to establish a prima facie case of age discrimination. For that reason, his ADEA claim fails.

---

[1] In paragraph 13 of his affidavit, Plaintiff stated that he was replaced by someone substantially younger. However, this conclusory, unsupported statement was stricken.

CONCLUSION

For the reasons set forth above, Hydro Aluminum's Motion to Strike is **GRANTED in PART and DENIED in PART** and Hydro Aluminum's Motion for Summary Judgment is **GRANTED**.  Accordingly, this case is **DISMISSED** and the clerk is **ORDERED** to close this case.


DATED:  **January 22, 2009**          **/s/RUDY LOZANO, Judge**
                                       **United States District Court**